NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SAMIL OZAVAR, | : |
| Plaintiff, | : Civil Action No. 24-11448-SDW-AME |
| v. | : OPINION and ORDER |
| AYSE HACISALIHOGLU LOUTTIT, in her individual capacity and in her capacity as the personal representative of the Estate of William Anthony Louttit, et al., | : |
| Defendants. | : |

**ESPINOSA, U.S.M.J.**

This matter is before the Court on the motion by plaintiff Samil Ozavar ("Plaintiff" or "Ozavar") to disqualify McCarter & English, LLP ("McCarter") from serving as counsel for defendants Ayse Hacisalihoglu Louttit, in her individual capacity ("Hacisalihoglu") and in her capacity as the personal representative of the Estate of William Anthony Louttit (the "Estate"), and W.A.L. & Associates, Inc. ("WAL") (collectively "Defendants") [D.E. 10]. Essentially, Plaintiff argues that McCarter's representation of Defendants in this action violates ethics rules prohibiting McCarter from representations adverse to a former client. Defendants oppose the motion, primarily on the basis that Ozavar is not McCarter's former client. The Court has considered the parties' written submissions, including Defendants' supplemental certification, filed with leave, and Plaintiff's response thereto. The Court also heard argument on August 14, 2025. For the following reasons, the motion to disqualify counsel is granted.

## I. BACKGROUND

### A. Factual and Procedural History

This breach of contract action arises out of an alleged agreement between Ozavar and the late William Anthony Louttit ("Louttit"), under which Ozavar claims he is entitled to a portion of the proceeds of his and Louttit's joint ventures, specifically money paid to WAL stemming from a private equity investor's partial acquisition of non-party Cibo Vita Inc. ("Cibo Vita"). The following factual summary is based on the allegations of the Complaint.[1]

Ozavar and Louttit had a long-standing professional relationship. When they met in 2013, Ozavar was working in Türkiye as a nutrition and food science specialist, and Louttit was working as executive vice president of sales for Cibo Vita, a packaged goods company based in New Jersey. *See* Compl. ¶ 12. Louttit introduced Ozavar to Cibo Vita's CEO, who offered him a position as product development manager. *Id.* ¶ 13. The Complaint alleges Ozavar and Louttit were not merely co-workers at Cibo Vita but were also involved in numerous ventures related to the food and beverage industry, typically pursuing these ventures through WAL. *Id.* ¶¶ 14-15. It further alleges that, although Louttit was the sole owner of WAL, "Louttit regarded Ozavar as his partner in [the company]" and held him out as such to others. *Id.* ¶ 15.

According to the Complaint, "Ozavar and Louttit had a general agreement that they would split the proceeds of any of their ventures, including those conducted through W.A.L., such that Louttit would receive 85% and Ozavar would receive 15%." *Id.* ¶ 16. Ozavar alleges that one of the business opportunities he and Louttit pursued together was the negotiation of a

---

[1] The factual background provides context for this Opinion concerning Plaintiff's motion for disqualification. It does not constitute a finding by the Court as to the truth of those allegations or the merits of the claims.

deal to continue working for Cibo Vita after it offered incentives to each of them in or about 2017. *Id.* ¶ 19. Ozavar asserts that, to leverage their collective value to Cibo Vita, Louttit "proposed that he [Louttit] would negotiate a deal with Cibo Vita through his company W.A.L., and any payouts from this deal would be divvied up with 85% of the proceeds going to Louttit and 15% of the proceeds going [to] Ozavar." *Id.* ¶ 21. Ozavar alleges he accepted Louttit's proposal, and according to the Complaint, their oral agreement concerning the payout from the Cibo Vita deal with WAL was also referenced in writings. *Id.*

Thereafter, the incentive deal offered by Cibo Vita was negotiated through legal representation provided by McCarter, resulting in the execution of a Sales Representative and Consulting Agreement between WAL and Cibo Vita on or about May 28, 2020 (the "Cibo Vita Agreement"). *Id.* ¶ 24; *see also* Vajtay Cert., Ex. 1. The Cibo Vita Agreement entitled WAL to receive a percentage of the net proceeds in the event more than 50% of Cibo Vita was sold, an amount Ozavar refers to as the "Cibo Vita Payout." Compl. ¶ 24.[2] The Complaint alleges that on or about October 11, 2023, a private equity firm agreed to acquire over 50% of Cibo Vita, thus triggering the Cibo Vita Agreement's provision concerning payment to WAL. *Id.* ¶¶ 27-28.

Ozavar claims he was entitled to receive 15% of the Cibo Vita Payout under his agreement with Louttit. *Id.* ¶¶ 29, 36. However, Louttit died on November 11, 2023, before that alleged contractual obligation was fulfilled, that is, before Ozavar collected his alleged share of the Cibo Vita Payout. *Id.* ¶ 31. Consequently, Louttit's assets, including WAL, came under the control of Estate administrator Hacisalihoglu, Louttit's widow and, according to the Complaint,

---

[2] The Cibo Vita Agreement refers to this payment as "Incentive Compensation." *See* Vajtay Cert. Ex. 1 ¶ 4c(i).

his sole beneficiary. *Id.* ¶¶ 33-34. The Complaint alleges that Ozavar made repeated requests to Hacisalihoglu for payment of his alleged portion of the Cibo Vita Payout, but she and the Estate refused to honor Louttit's agreement with Ozavar. *Id.* ¶ 37.

On December 12, 2024, Ozavar filed this action, asserting four claims against Hacisalihoglu and the Estate: breach of contract, promissory estoppel, unjust enrichment, and tortious interference with contract.[3] McCarter thereafter entered an appearance for Defendants and filed a motion to dismiss the tortious interference claim. On March 26, 2025, Ozavar filed this motion to disqualify McCarter from serving as counsel for Defendants.[4]

### B. McCarter's Engagement Related to the Cibo Vita Agreement

As set forth above, McCarter was retained to negotiate the Cibo Vita Agreement. The key question on this motion for disqualification is whether Ozavar and McCarter were in an attorney-client relationship related to that engagement. Ozavar and Stephen M. Vajtay, Jr. ("Vajtay"), the McCarter attorney who was personally involved with negotiating the Cibo Vita Agreement, have each provided a sworn statement setting forth facts pertinent to this question, as follows.

Ozavar states that it was Louttit who reached out to McCarter "to aid us in negotiating and drafting the Cibo Vita Agreement." Ozavar Decl. ¶ 14. In preparation for the meeting with counsel, Louttit sent Ozavar an email on November 10, 2018, with the subject heading "Attorney Discussion Notes." *Id.* Ex. 1 at 6. That email contained a list, under each of their names, of various topics apparently related to the Cibo Vita deal, including under "Samil [Ozavar]:

---

[3] The Court has subject matter jurisdiction over this action based on diversity. 28 U.S.C. § 1332(a).

[4] The motion to dismiss was administratively terminated pending the outcome of the Court-facilitated settlement conference, in which the parties voluntarily engaged on September 10, 2025, notwithstanding this pending motion for disqualification of counsel. Having failed to reach a negotiated resolution, the parties requested the Court proceed with the motions. *See* Sept. 19, 2025 Ltr. [D.E. 20].

Commission … Success Fee … Timing; Now?, Cibo Purchase agreement, Cibo closing?" and under "Bill [Louttit]": Bulletproof deal … Commissions … Life after closing." *Id.* The November 10 email was exchanged between Louttit's and Ozavar's WAL email addresses bill@walassociates.com and samil@walassociates.com.

On November 13, 2018, Louttit sent an email to Vajtay, copied to Ozavar, with the same subject heading, "Attorney Discussion Notes." *Id.* Ex. 1 at 5. The November 13 email advised that Cibo Vita has just hired counsel to help put the company up for sale, attached Louttit's then-current agreement with Cibo Vita, and stated he "would like to fortify this agreement." *Id.* In that same email, Louttit further stated as follows:

> Also, related:
>
> -- Samil Ozavar is my partner in WAL & Assoc, my consulting company
> -- And we are partnered on Sensibl Inc, a Functional Water company, just launching
> -- Samil also works for cibo Vita [sic]
> -- Cibo Vita and Sensbl have exclusive agreements with anobio, an Irish company, for the use of encapsulated probiotics in products distributed by both Cibo Vita as Snacks and Sensbl as Waters.
>
> Amil [sic] will send along his current unsigned Cibo agreement and his previous signed agreement.
> He will also send you the Aobio [sic] agreements.
>
> After your doc review we can have a conference call or meet to discuss the relevant issues further.
> Below are the brief prelim bullet points on the issues that we thought important.
>
> Thanks.

*Id.* In the message chain he sent to Vajtay, Louttit included his November 10 email exchange with Ozavar, listing the topics they wanted to cover with counsel. *Id.*

5

On November 14, 2018, Vajtay responded to both Louttit and Ozavar, opening his email with the salutation "Gentlemen" and therein asking for each of their addresses to complete a conflict search. *Id.* They proceeded to exchange messages in that same thread to set up a meeting. *Id.* Ex. 1 at 3-4. Ozavar sent a November 14, 2018 email to Vajtay providing his address and also attaching a copy of his own "agreement language with Cibo Vita as well as a copy of the agreement between Cibo Vita and Anabio Ltd." Vajtay Cert. Ex. 3 at 1. On that same date, Ozavar sent Vajtay a second email, at Louttit's urging, in which Ozavar stated as follows:

> Steve,
>
> Further to my earlier email that had the Cibo Vita – Anabio Agreement and my own agreement wit [sic] Cibo Vita, attached you may also find the Sesible Anabio Agreement. However we did not conduct the down payment on time so we have discussed that there will be a new Sensbl-Anabio Agreement to replace this one once we are ready to conduct the down payment.
>
> Best Regards,
> Samil

*Id.* Ex. 3 at 9. Vajtay acknowledges receiving Ozavar's November 14 emails but states he did not review, address, or discuss those other agreements with either Ozavar or Louttit, because "Ozavar was not the Firm's client." Vajtay Cert. ¶ 13.

On November 19, 2018, McCarter sent Louttit—but not Ozavar—an Engagement Letter, which Louttit executed on behalf of WAL on November 26, 2018 (the "Engagement Letter"). *Id.* Ex. 2; Ozavar Decl. Ex. 1 at 2. The Engagement Letter stated McCarter had been asked "to represent WAL & Associates Inc. ("WAL") with respect to the negotiation of an amended and restated Representation and Consulting Agreement with Cibo Vita Inc." Vajtay Cert. Ex. 2. It defined the scope of representation and set the terms of the engagement, in relevant part, as follows:

6

> For purposes of this engagement, this firm will be representing the interests of WAL and you [Louttit] only. That said, in the course of the proposed representation, we understand that we may be asked to perform services for certain business associates of WAL including Samil Ozavar. Your execution of this letter will serve as your acknowledgment that this Firm shall deem WAL and you as its only clients for purposes of this representation and that in the event of any potential conflict associated with representation of WAL associates, we will advise you that those associates need to secure separate counsel.

*Id.* It appears Louttit thereafter forwarded to Ozavar the Engagement Letter and an email from Vajtay indicating when a draft of the agreement would be ready. Ozavar Decl. Ex. 1 at 1-2.

McCarter provided legal services pursuant to the Engagement Letter for approximately the next eighteen months, until the Cibo Vita Agreement was executed in May 2020. Ozavar Decl. ¶ 21; Vajtay Cert. Ex. 1 and 2. Concerning that legal advice, Ozavar asserts:

> During this time, I was intimately involved in McCarter & English's provision of legal services. For instance, I was included on over 100 e-mails and participated in numerous phone calls with McCarter & English related to the Cibo Vita Agreement. In fact, in at least one of these emails Vajtay asked me (and Louttit) to comment on a draft of the Cibo Vita Agreement … I do not imagine there were many, if any, communications in which I was not included in connection with McCarter & English's representation pursuant to the Engagement Letter.

Ozavar Decl. ¶ 22.

Ozavar states that, as Louttit's partner in WAL, he had a direct interest in several of the Cibo Vita Agreement's provisions, including the payout provision and the non-compete provisions. *Id.* ¶ 23. He further states that McCarter in fact consulted with Ozavar concerning his skillset so that it could appropriately define the non-compete provision. *Id.* In sum, Ozavar asserts that, given his integral involvement in McCarter's provision of legal advice related to the Cibo Vita Agreement and the Engagement Letter's statement that McCarter would provide him with legal services, he believed he was in an attorney-client relationship with the firm. *Id.* ¶ 24.

7

Vajtay concedes Ozavar was included in phone and email communications McCarter had with Louttit concerning the Cibo Vita Agreement but explains this was done because "Louttit had previously indicated Ozavar was involved with WAL and [thus] it made sense to obtain his input and views." Vajtay Cert. ¶ 11. According to Vajtay, "Ozavar was kept in the loop, at Louttit's repeated insistence, regarding the work I was doing for WAL and Louttit." *Id.* Vajtay states: "While I understand Ozavar alleges he was intended to be a beneficiary of the work performed by WAL and Louttit, the Firm's services were not designed to provide him with an individual or unique benefit. Instead, any benefit he might receive was incidental to the Firm's engagement by WAL and Louttit." *Id.* ¶ 12. He also points out that payment for McCarter's services was remitted by WAL and that the firm never sent an invoice to Ozavar for any services or received monies from him. *Id.* ¶ 8. In short, Vajtay unequivocally asserts "he never considered Ozavar to be a client and … did not provide him with independent legal counsel or services for him personally." *Id.* ¶ 6.

## II. DISCUSSION

### A.  Legal Standard

"The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). "As a general rule, the exercise of this authority is committed to the sound discretion of the district court." *Id.* Counsel may be disqualified for violation of a governing ethical rule or if "sufficient doubt exists as to the propriety of representation." *Maldonado v. New Jersey*, 225 F.R.D. 120, 137 (D.N.J. 2004). However, because disqualification can have drastic consequences, it is a measure to be avoided unless necessary.

*Id. See also Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993) (holding same).

The question of attorney disqualification is "intensely fact-specific." *Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996). "It is essential to approach such problems with a keen sense of practicality as well as a precise picture of the underlying facts." *Id.* (quoting *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121, 1124 (N.D. Ohio 1990)). The Court must closely scrutinize the proffered factual basis for disqualification "to prevent unjust results." *Id. See also Carreno v. City of Newark*, 834 F. Supp. 2d 217, 224 (D.N.J. 2011) (holding "surmise alone cannot support an order of disqualification."). Even when a motion to disqualify is made in good faith, and not for tactical advantage by one party over another, unnecessary delay in the litigation should be avoided. *Carlyle Towers*, 944 F. Supp. at 345. "Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a heavy burden and must meet a high standard of proof before a lawyer is disqualified." *Alexander*, 822 F. Supp. at 1114 (cleaned up). *See also Carlyle Towers*, 944 F. Supp. at 345 (holding same).

### B.  Analysis under the Rules of Professional Conduct

Here, Ozavar maintains McCarter must be disqualified as counsel for Defendants because its representation violates New Jersey Rules of Professional Conduct ("RPC") 1.9 and 1.10, which govern an attorney's ethical duties to a former client.[5] In relevant part, RPC 1.9(a) states:

---

[5] District of New Jersey Local Civil Rule 103.1(a) provides that "the Rules of Professional Conduct ("RPC") of the American Bar Association, as revised by the New Jersey Supreme Court shall govern the conduct of attorneys admitted to practice in this Court." *See also Blueprint Capital Advisors, LLC v. New Jersey*, Civil No. 20-7663, 2025 WL 1040380, at *4 (D.N.J. Apr. 8, 2025) (applying New Jersey's RPC to determine whether an attorney should be disqualified under the governing ethics rules).

"A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." In turn, RPC 1.10(a) prohibits representation by any other attorney associated with the firm employing the attorney disqualified under RPC 1.9, unless the underlying conflict is based on the disqualified attorney's personal interest and does not present a significant risk of limiting the client's representation by the firm's other lawyers. In other words, "[a]n attorney's conflict of interest under RPC 1.9(a) is imputed to the attorney's firm through RPC 1.10." *Ford Motor Co. v. Edgewood Props., Inc.*, Civil No. 06-1278, 2011 WL 5080347, at *3 (D.N.J. Oct. 25, 2011).

Thus, to establish the Court should disqualify McCarter from representing Defendants here, Ozavar must demonstrate (1) he and McCarter had an attorney-client relationship; (2) that representation concerned a matter that is the same or substantially related to the subject matter of this action; and (3) his interests are materially adverse to those of McCarter's current clients, that is, the Defendants. The parties' dispute on this motion centers on whether an attorney-client relationship previously existed between Ozavar and McCarter. As set forth in detail below, the record demonstrates Ozavar reasonably believed himself to be in an attorney-client relationship with McCarter concerning the Cibo Vita Agreement, that Agreement is substantially related to the subject matter of this action, and Ozavar's interests are materially adverse to Defendant's interests. Consequently, each requirement for disqualification is met.

       1.  <u>Prior Attorney-Client Relationship</u>

Ozavar primarily argues he is McCarter's former client based on the plain, express language of the Engagement Letter. Alternatively, he argues that, under the totality of the

circumstances, he reasonably believed McCarter represented him in connection with the

negotiation and drafting of the Cibo Vita Agreement, and thus an implied attorney-client

relationship was formed. In opposition, McCarter relies heavily on the Engagement Letter,

arguing it clearly stated the firm's representation was limited to WAL and Louttit.

New Jersey law defines a lawyer's client as "a person or corporation or other association

that, directly or through an authorized representative, consults a lawyer or the lawyer's

representative for the purpose of retaining the lawyer or securing legal services or advice from

[the lawyer] in the [the lawyer's] professional capacity." N.J.S.A. 2A:84A-20(3)(a). An attorney-

client relationship may be express or implied. *Speeney v. Rutgers*, 673 F. App'x 149, 153 (3d

Cir. 2016). "An express attorney-client relationship 'is created with respect to a particular

matter' when 'a person manifests to a lawyer that person's intent that the lawyer provide legal

services' and 'the lawyer manifests to the person consent to do so.'" *Id.* (quoting *Dixon

Ticonderoga Co. v. Estate of O'Connor*, 248 F.3d 151, 169 (3d Cir. 2001)). "An implied

attorney-client relationship is created when 'a person manifests to a lawyer the person's intent

that the lawyer provide legal services to the person, the lawyer fails to manifest lack of consent

to do so, and the lawyer knows or reasonably should know that the person reasonably relies on

the lawyer to provide the services.'" *Id.* (quoting *Dixon Ticonderoga*, 248 F.3d at 169) (cleaned

up). Yet, an implied attorney-client relationship must be based upon more than the putative

client's subjective belief. *Oestreicher v. Rutgers*, Civil No. 02-959, 2015 WL 6460423, at *6

(D.N.J. Oct. 26, 2015). There must be an objectively reasonable basis, "under the totality of the

circumstances," for the client to believe that the relationship was formed. *Id.*

The Court finds Ozavar has not demonstrated the existence of an express attorney client relationship with McCarter. He fails to point to any retainer agreement or other document executed by him and McCarter that unequivocally establishes him as the firm's client. Although he relies on the Engagement Letter, Ozavar elides the fact that he did not sign the letter as "client" and was not labeled as the firm's client therein. Ozavar also fails to point to any evidence of a communication in which Vajtay or another McCarter attorney explicitly agreed to serve as his counsel, beyond his mention in the Engagement Letter as a potential client. Nor does Ozavar dispute Vajtay's assertion that McCarter did not bill or collect any fees from Ozavar in connection with the work done on the Cibo Vita Agreement. While "an attorney-client relationship is not dependent on the payment of a fee or execution of a written contract," *Speeney*, 673 F. App'x at 153, the record here lacks the usual indicia of an express attorney-client relationship.

However, the factual circumstances surrounding Ozavar's relationship with McCarter, in their totality, establish that Ozavar reasonably believed McCarter was his legal counsel. To begin, Louttit and Ozavar jointly approached McCarter seeking legal counsel. Louttit's November 13, 2018 email to McCarter attorney Vajtay, copied to Ozavar, stated the two were partners in WAL and requested McCarter represent WAL in negotiating an agreement with Cibo Vita in contemplation of a potential sale of that company to an investor. That email conveyed to Vajtay the topics Louttit and Ozavar wanted to discuss with their attorney, listed separately under a heading bearing each man's name. Although as a legal matter, Ozavar was neither a partner in WAL, a corporate entity, nor a shareholder of the company, he and Louttit clearly expressed their request for McCarter's legal counsel.

In response, Vajtay emailed Louttit and Ozavar, asking each to provide information required to run a conflict check. Vajtay's email reflects his understanding that both Louttit and Ozavar wanted to retain McCarter, if not personally then at least insofar as they may have held an interest in WAL. On November 14, 2018, Ozavar responded to Vajtay with his full name and home address and provided a copy of his own draft agreement with Cibo Vita, an agreement between Cibo Vita and a third-party company, and a third agreement involving that third party. Vajtay took no action as to those agreements and did not respond to Ozavar's November 14 emails. However, Vajtay's silence cannot be fairly construed as manifesting a lack of consent to represent Ozavar, separately or together with WAL, in view of the November 13 and 14 emails expressing a desire that McCarter provide Louttit and Ozavar legal advice on obtaining incentives from Cibo Vita related to its sale. New Jersey law addressing the creation of implied attorney-client relationships holds that once an individual manifests his intent that a lawyer provide legal services, the lawyer must manifest his lack of consent if the lawyer knows or should know that person reasonably relies on him to provide legal services. *See Speeney*, 673 F. App'x at 153; *Dixon Ticonderoga*, 248 F.3d at 169. In the face of Ozavar's initial communications, it was incumbent on Vajtay to either expressly decline Ozavar's request for representation or otherwise make clear that McCarter would not serve as counsel for him. The need for this clarification is underscored by the fact that, when they approached McCarter, Louttit and Ozavar held each other out as "partners" in WAL, the company through which the incentive deal with Cibo Vita would be negotiated.

McCarter thereafter prepared the Engagement Letter and sent it to Louttit. Louttit signed the Engagement Letter on behalf of WAL and forwarded a copy to Ozavar. Despite McCarter's

argument that its language belies Ozavar's position that he reasonably understood McCarter to be his counsel, the Engagement Letter does not dispel confusion but, rather, intensifies it. It states McCarter represents the interests of WAL and Louttit only but also acknowledges that the firm "may be asked to perform services for … Samil Ozavar." Vajtay Cert. Ex. 2 at 1. Although McCarter placed a condition on its provision of legal services to Ozavar, stating they may be declined in the event of a potential conflict, the Engagement Letter, at best, ambiguously outlines the contours of McCarter's relationship with Ozavar as it pertains to the drafting and negotiation of the Cibo Vita Agreement.[6] Indeed, to a non-lawyer like Ozavar and in the context of these specific facts, the Engagement Letter's conditional language—that a conflict will trigger a declination of service—may suggest that the absence of an express declination of service from McCarter meant the firm was providing him with legal services. Viewed in the light most favorable to Ozavar, that is, construing its ambiguity against the drafter, the Engagement Letter reinforces Ozavar's reasonable belief that he was in an attorney-client relationship with McCarter because it expressly identifies him, by name, as falling within the ambit of the engagement.

The ensuing course of conduct among Vajtay, Louttit, and Ozavar further contributed to Ozavar's reasonable belief that he was included in the attorney-client relationship. Ozavar asserts he participated in almost all, if not all, the communications Louttit had with Vajtay pertaining to the Cibo Vita Agreement, a fact which McCarter does not dispute. Ozavar states that between November 2018 and May 2020, he was included in over 100 emails and numerous phone calls

---

[6] The Court notes there is no evidence in the record showing that such a conflict and related refusal to provide services arose during the engagement.

about the Cibo Vita Agreement and even asked by Vajtay to comment on the draft agreement, by email circulated in September 2019.

Vajtay asserts he included Ozavar in the communications only at Louttit's insistence, did not regard him as a client, and understood him to be an incidental beneficiary of the Cibo Vita Agreement. The Court acknowledges those assertions. However, two things can be true at once. That is, Vajtay may not have considered Ozavar to be McCarter's client, while Ozavar reasonably believed he was. Counsel's subjective perspective on the arrangement does not diminish that it was objectively reasonable for Ozavar, a non-lawyer, to have considered McCarter his counsel and relied on the legal advice it provided in the many communications discussing the preparation of the Cibo Vita Agreement in which Ozavar was included. Moreover, given the way the relationship among McCarter, Louttit, and Ozavar began and developed, Vajtay and by extension McCarter, should have known that Ozavar would rely on their legal advice, especially in the absence of an unequivocal statement by them manifesting a lack of consent to provide Ozavar with legal advice, like a letter, email, or other such statement.

The foregoing analysis is not altered by the different outcome reached by the New Jersey Appellate Division in *Royzenshteyn v. Pathak*, a case on which Defendants rely heavily to argue that Ozavar's mere inclusion in numerous legal discussions concerning the Cibo Vita Agreement did not render McCarter his attorney. *See* No. A-1386-22, 2024 WL 16141 (N.J. App. Div. Jan. 2, 2024). *Royzenshteyn* considered whether, in deciding a discovery dispute, the trial court had properly concluded that the plaintiffs, who were the principals and sole shareholders of the defendant corporation, held no attorney-client privilege over certain communications they had with lawyers for the corporation in connection with a sale of its shares. *Id.* at *1. Determining

whether the principals could assert the privilege required resolution of the threshold question concerning existence of an attorney-client relationship, that is, whether counsel represented only the corporation or the corporation and its principals jointly. The trial court assigned a special master to develop the facts concerning that question and issue findings. *Id.* at *1-2. The special master considered the parties' written submissions and conducted a plenary hearing at which he took the testimony of only one witness, the attorney who worked on the corporation's sale transaction, but, notably, refused to consider contradictory evidence provided by one of the principals in a post-hearing submission, reasoning that person could have testified at the hearing but did not. *Id.* at *3. Thereafter, the special master concluded that the principals had failed to carry their burden of demonstrating an implied attorney-client relationship existed between them and the corporation's lawyer and, consequently, had no right to assert privilege, emphasizing that counsel's engagement letter to the corporation made no mention of the principals. *Id.* The trial court adopted the special master's findings and recommendations and compelled the plaintiffs to produce the documents in dispute. *Id.*

The Appellate Division affirmed, reasoning the factual record supported the special master's underlying findings. *Id.* at *4-5. That court noted the special master had found the attorney's testimony consistent with the retainer letter, which "clearly identified [the corporation] as the only client and stated that if any individual were to be represented, there would have to be a written agreement memorializing that representation." *Id.* at *3. In short, *Royzenshteyn* concluded there was no reason to disturb the trial court's discovery decision as it was supported

16

by "substantial, credible evidence" whereas there was no evidence in the record of an implied attorney-client relationship between counsel and the corporation's principals.[7] *Id.* at *5.

In contrast, the issue here is not a discovery matter to be resolved on a factual record devoid of any indication of an implied attorney client relationship. Rather, the motion before this Court focuses on the application of the Rules of Professional Conduct and is based on facts substantially distinct from those presented in *Royzenshteyn*. Without reiterating every fact set forth above, the Court highlights, among other differences, Ozavar's sworn statement describing his involvement in WAL, his relationship with Louttit, and the manner in which they both approached McCarter for legal advice; the various emails between and among Ozavar, Louttit, and McCarter; the language of the Engagement Letter, which mentions Ozavar by name as a person to whom McCarter may provide legal services; and the course of conduct throughout the engagement until the Cibo Vita Agreement was executed in 2020, including the many attorney-client communications Vajtay directed to Louttit and Ozavar. Those intensive fact differences easily distinguish *Royzenshteyn*.

Also unavailing to Defendants' argument that no attorney-client relationship existed between Ozavar and McCarter are the two additional documents they submitted after briefing had closed and after the Court heard oral argument.[8] Those documents, uncovered by Defendants' counsel while searching Louttit's personal laptop and cell phone in preparation for the September 10, 2025 settlement conference, consist of (1) a February 24, 2021

---

[7] *Royzenshteyn* also noted that, under RPC 1.13, the attorney retained by a corporation normally represents that corporation, not its directors, officers, employees or other constituents. 2024 WL 16141, at *4.

[8] The Court granted Defendants' request to expand the record and gave Plaintiff an opportunity to respond. *See* Sept. 29, 2025 Order [D.E. 23].

communication between Ozavar and Cibo Vita's CEO concerning efforts to finalize a memorandum of understanding for Ozavar's continued services as a consultant and (2) a one-page summary documenting Ozavar's August 30, 2021 filing with the United States Patent and Trademark Office's Trademark Trial and Appeal Board, made on his behalf by attorney Sandy Lipkin. Wallach Cert. ¶¶ 2-3, Ex. A and B. Ozavar's apparent pursuit of his own, separate agreement with Cibo Vita, *after* the Cibo Vita Agreement was finalized and executed in May 2020, does not undermine the previously discussed facts demonstrating his deliberate inclusion, by Louttit with McCarter's acquiescence, within the scope of the Cibo Vita Agreement's earlier negotiation or Ozavar's reasonable belief in the existence of an attorney-client relationship with McCarter based thereon. Ozavar's separate trademark-related filing, through legal counsel provided by a firm other than McCarter, likewise sheds no light on the existence of a prior attorney-client relationship between Ozavar and McCarter on a completely unrelated matter.

The key question on the first prong of this disqualification analysis is whether, having expressed an intent to be represented by McCarter, Ozavar had an objectively reasonable belief that an attorney-client relationship was formed. The Court finds, based on the totality of the facts, he did. The depth and extent of Ozavar's involvement in legal discussions concerning the Cibo Vita Agreement, set against the backdrop of his and Louttit's initiation of contact with McCarter, Louttit's and Ozavar's professed albeit erroneous understanding that they were formal partners in WAL, Ozavar's inclusion, by name, in the Engagement Letter, and the absence of any persuasive evidence in the record of an unambiguous manifestation by McCarter to make clear that Ozavar was not within the scope of representation on the Cibo Vita Agreement, taken

together, all support Ozavar's reasonable belief that a prior attorney-client relationship with McCarter existed.

### 2. Same or Substantially Related

There is no reasonable dispute that this action and the previous representation involving McCarter are substantially related. Here, McCarter represents Hacisalihoglu and the Estate against Ozavar's claims that they have breached a contract between him and Louttit and/or have otherwise been unjustly enriched by failing to pay Ozavar an agreed-upon portion of the money WAL received pursuant to the Cibo Vita Agreement. The previous engagement concerned exactly that agreement, specifically negotiation and drafting of the various provisions for the benefit of WAL, and according to Ozavar, for his benefit, too. Although Ozavar's current claims arise out of a separate agreement he and Louttit had purportedly entered into, those claims are clearly derivative of the Cibo Vita Agreement and the triggering of its payout provision by the private equity acquisition. Therefore, the Court finds that this second prong of the attorney disqualification analysis is satisfied.

### 3. Materially Adverse

The third prong of the disqualification analysis under RPCs 1.9 and 1.10 requires the interest of the prior and current client to be materially adverse. Ozavar's breach of contract and related claims against the Estate position the parties in an adverse posture, a fact the parties do not dispute on this motion.

### C. Balancing of Interests

When presented with a motion to disqualify counsel, the Court "must balance the hardships to the client whose lawyer is sought to be disqualified against the potential harm to the

adversary should the attorney be permitted to proceed." *In re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d 235, 249 (D.N.J. 2000). Factors informing the parties' relative hardships include (1) prejudice to the parties; (2) whether counsel had prior access to the movant's confidential information relevant to the current action; (3) the cost and time for the non-movant to retain new counsel; (4) the complexity of the issues in the case; and (5) which party, if either, was responsible for creating the conflict. *See Wyeth v. Abbott Laboratories*, 692 F. Supp. 2d 453, 459 (D.N.J. 2010) (citing *Carlyle Towers*, 944 F. Supp. at 348). At bottom, the competing interests at stake on a motion for disqualification are "the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." *Cendant Corp.*, 124 F. Supp. 2d at 249 (cleaned up); *see also City of Atlantic City v. Troupos*, 201 N.J. 447, 462 (2010) (holding these competing interests must be balanced to determine whether disqualification is warranted under RPC 1.9(a)). However, the District Court has stressed that the weight of authority holds that deference to a litigant's choice of counsel must give way to the Court's responsibility to uphold ethical rules and preserve the integrity of the proceedings. *Cendant Corp.*, 124 F. Supp. 2d at 249-50 (citing *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 218 (1988)).

Although disqualification is a drastic measure and one this Court considers only with caution and great care, the relative hardships on the parties here further militate in favor of granting the relief sought on this motion. Ozavar has presented sufficient evidence that he and McCarter were previously in an attorney-client relationship concerning the Cibo Vita Agreement, which forms a core underlying basis for Ozavar's claims that the Estate owes him a portion of the Cibo Vita Payout obtained by Louttit thereunder. Thus, Ozavar now faces a genuine risk that information he or Louttit shared in confidence in their many discussions with

McCarter may work to Ozavar's detriment in this action, or at the very least impact the fairness of the adversarial process while Ozavar litigates his claims against Defendants. Moreover, McCarter could easily have avoided this disqualification question in 2018 with a single letter, email, or phone call to Ozavar, expressly declining to represent him. Also, disqualification of counsel poses relatively lesser potential harm to Defendants at this very early stage in the case. They have not yet filed an Answer to the Complaint, and thus a substitution of counsel will not unduly disrupt or delay proceedings in this straightforward breach of contract action. Consequently, the balance of hardships weighs in favor of disqualification.

In sum, Ozavar has carried his heavy burden of demonstrating McCarter should be disqualified from representing Defendants in this action. Having applied law to facts to reach that conclusion, the Court emphasizes that the decision to grant the relief Ozavar seeks on this motion is not based on any failure by McCarter to represent its clients zealously and ethically. To the contrary, the record is bare of any indication of affirmative unethical behavior by counsel. However, the Rules of Professional Conduct are as much intended to ensure that attorneys abide by ethical standards as they are meant to protect the fundamental fairness of legal proceedings. Here, it is the latter concern that animates the Court's decision. In view of the foregoing considerations and the history presented on this factual record, any doubts about whether McCarter's continued representation of Defendants comports with RPCs 1.9 and 1.10 must be resolved in favor of disqualification. *See Alexander*, 822 F. Supp. at 1114 ("Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a heavy burden and must meet a high standard of proof before a lawyer is disqualified.") (cleaned up).

21

### III.    CONCLUSION AND ORDER

For the foregoing reasons, the Court concludes counsel's disqualification is warranted. Accordingly,

**IT IS** on this 28th day of October 2025,

**ORDERED** that Plaintiff's motion to disqualify McCarter & English from serving as Defendants' counsel [D.E. 10] is **GRANTED**; and it is further

**ORDERED** that to afford Defendants sufficient time to secure new counsel, this action is stayed for 30 days; and it is further

**ORDERED** that Defendants' previously filed motion to dismiss shall remain administratively terminated during the pendency of the stay.

 /s/ *André M. Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge